**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**GWENDOLYN D. DONALDSON**                                         **PLAINTIFF**

**VS.**                                         **CIVIL ACTION NO: 2:07CV122-KS-MTP**

**CDB, Inc., d/b/a POPEYES
and John Does 1-5**                                                    **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This cause is before the Court on a motion for summary judgment [#32] filed by the Defendant CDB, Inc., seeking to dismiss all Plaintiff Donaldson's sexual harassment, retaliation and state law tort claims. Because Plaintiff has failed to show the existence of any genuine issues of material fact surrounding her claims, Defendant's motion should be granted.

**I. FACTUAL BACKGROUND**

On January 13, 2006, Gwendolyn Diane Donaldson ("Donaldson") was hired by CDB, Inc., d/b/a Popeye's Chicken and Biscuits ("CDB") as a crew member for its restaurant on Highway 98 in Hattiesburg. She received a copy of the "Crew Member Handbook" describing the restaurant's policies, including its policy on sexual harassment. The handbook instructed employees to discuss harassment matters with their managers, but encouraged them to contact their supervisor or owner if they felt uncomfortable talking to the manager or that the complaint was not being addressed. *See* Def.'s Ex. C at 8 [Doc. 33-4] (May 14, 2008). She signed the "Handbook Agreement" acknowledging that she understood and agreed to all the conditions stated therein.

After only five weeks at the store, Donaldson was receiving praise from her superiors. Assistant manager Tonya Johnson informed her that when the next assistant manager position became available, general manager Wanda Amos was going to recommend her for the job. *See* Def.'s Ex. D at 10 [Doc. 33-5] (May 15, 2008). Allan Patterson, another supervisor, told Donaldson that he "saw a lot of potential in her" and encouraged her to keep up the good work. *Id.* Donaldson was satisfied with her job and believed she was doing well, but her outlook changed when Derrick McLaurin ("McLaurin") joined the CDB team.

In April 2006, McLaurin replaced Amos as the general manager of the Highway 98 store. Donaldson, worried that this change in management might affect her chances at a promotion, confided in coworker Ben Sullivan. Rather than ease her worries, Sullivan told her that she would either have to "snitch on someone" or "sleep with Maurice Williams," the area supervisor, to become assistant manager. *See* Def.'s App. 51 [Doc.33-14] (May 15, 2008). McLaurin effectively refuted this belief when he told Donaldson that Allan Patterson was pushing him to send her to management training and that he would have a "bad taste in his mouth" if Patterson and Williams continued to seek promotions for employees with whom they had slept. *Id.*

Donaldson claims that McLaurin's offensive behavior began approximately one month after he started working at the store. *See* Def.'s App. 53 [Doc.33-14] (May 15, 2008). At times his comments were directed at specific individuals.[1] Often, though, they were made generally to

---

[1] Donaldson discusses comments made by McLaurin to two other female coworkers, Jaeon Daniels and Kewaii Jordan. When Jaeon Daniels came to work one day, McLaurin asked her if she had turned off the television because he had forgotten to do so when he got out of her bed; he also told her that he "didn't see why anyone would want her" and once asked "if it was her time of the month because something smelled stank (sic)." *See* Def.'s Ex. D at 13 [Doc. 33-5] (May 15, 2008). McLaurin's comment to Jordan occurred on one of Donaldson's days off, but McLaurin relayed the incident to her: there were flies swarming in the lobby while Jordan was eating lunch, and McLaurin told said that "he couldn't understand where they were coming from then Kewaii opened her legs and all the flies swarmed between her legs." *Id.*

the store employees. When an attractive female customer entered the store, McLaurin and other male employees would call out "Code Red." *See* Def.'s App. 53 [Doc.33-14] (May 15, 2008). He would discuss his sexual performance with crew members, saying once that he "only had two minutes for a woman and she better hurry up and get hers because he was going to get his." *See* Def.'s Ex. D at 12 [Doc. 33-5] (May 15, 2008). He also referred to his private parts as Georgia Pacific (log trucks), and would comment each time a truck passed by the restaurant. *See* Def.'s App. 55 [Doc. 33-14] (May 15, 2008).

One morning Donaldson came into the store limping from a work-related injury.[2] She claims that, when McLaurin noticed her limping, he remarked that her boyfriend must have tried to put her foot over her head to "get it in." *See* Def.'s App. 54 [Doc. 33-14] (May 15, 2008). This was the first time McLaurin directed any comment to Donaldson. *Id.* Donaldson claims that McLaurin made remarks to her on several other occasions during his first few months. Once, when McLaurin was trying to get past her in a cramped area of the store, he looked down at her breasts and told her to "move those things out of the way." *Id.* Donaldson alleges that McLaurin, after overhearing her tell a coworker that she was trying "to get her life right," told her that she "needed to get her body right" because she was "bad built." *See* Def.'s Ex. D at12 [Doc. 33-5] (May 15, 2008). She further alleges that he repeatedly told her that she needed a new bra, and even informed her of her promotion to assistant manager by saying, "Buy a new bra and report to store 49." *Id.*

---

[2] Donaldson alleges this injury occurred in the store in February 2006. *See* Def.'s Ex. D at10 [Doc. 33-5] (May 15, 2008).

On June 19, 2006, based upon the recommendation of McLaurin,[3] Donaldson went to the Highway 49 store to begin assistant manager training. Part of the training program for all CDB managers consists of a home study course on employment laws including, but not limited to, the Civil Rights Act, sexual harassment and fair labor practices. *See* Def.'s Ex. G [Doc. 33-8] (May 15, 2008). Management trainees must pass an online test, administered by the national Popeye's franchisor, on the material covered in the Management Training Manual. Donaldson passed the online test, but admits that she did not read the material on employment laws. *See* Def.'s App. 59 [Doc. 33-14] (May 15, 2008).

During her training at the Highway 49 store, McLaurin occasionally came to observe Donaldson's progress. Although he made no sexual or offensive comments while there, and Donaldson admits that he had a legitimate business purpose for observing her, she still found his presence menacing. *Id.* at 60.

On August 2, 2006, Donaldson completed her management training and returned to the Highway 98 store as an assistant manager. After this point, according to Donaldson, McLaurin's "harassment became more than she could tolerate." *See* Pl.'s First Am. Compl. ¶ 14 [Doc. 4] (June 19, 2007). In particular, she stresses an instance that allegedly occurred one night when she and her coworker Cassie Ross were closing the store. Donaldson had previously mentioned to Ross that she thought the manager of the SpeeDee Lube Shop across the street liked her. Ross, while talking on the phone to McLaurin, told Donaldson that "[McLaurin] said you need to ride

---

[3] Maurice Williams, the area supervisor for CDB responsible for all management decisions, stated in his affidavit that "based upon the recommendation of Derrick McLaurin, [Williams] approved a … promotion of Gwendolyn Donaldson to an assistant manager training program…." *See* Def.'s Ex. F ¶ 3 [Doc. 33-7] (May 15, 2008). Donaldson, however, denies McLaurin had anything to do with her promotion; she maintains that she had already been advised by Tonya Johnson that Wanda Amos was going to recommend her for the next assistant manager position. *See* Def.'s Ex. D at 10 [Doc. 33-5] (May 15, 2008).

the SpeeDee man so that he could get a free oil change and spark plugs." *See* Def.'s Ex. D at 13 [Doc. 33-5] (May 15, 2008). Ross then gave the phone to Donaldson so McLaurin could repeat his comment. When Donaldson next saw McLaurin, she asked him what he had meant by the SpeeDee remark and he replied, "You are a woman, you know how to get what you want out of a man, so go over there to SpeeDee and do it so I can get an oil change and Kewaii [a coworker] can get one too." *Id.*

In early September 2006, Donaldson contacted the EEOC to file a sexual harassment complaint against McLaurin and CDB. The EEOC investigator asked her if she had informed anyone at CDB of the alleged harassment, and Donaldson said that she had not.[4] The investigator refused to file her complaint until CDB had been given an opportunity to investigate and remedy the allegations. *See* Def.'s App. at 63 [Doc. 33-5] (May 15, 2008). On September 18, 2006, Donaldson notified Becky Anderson, the administrative assistant to CDB President David Chunn, of the alleged harassment. *See* Def.'s Ex. E ¶ 4 [Doc. 33-6] (May 15, 2008). Three days later she filed a Charge of Discrimination with the EEOC. *See* Def.'s Ex. H [Doc. 33-9] (May 15, 2008). When Chunn learned that a formal complaint had been filed, he hired outside counsel to investigate Donaldson's claim. *See* Def.'s Ex. B ¶ 6 [Doc. 33-3] (May 15, 2008). Believing it to be in the best interest of CDB, Chunn decided not to discuss the case with Donaldson; instead CDB would address her claims by responding directly to the EEOC. *Id.* at ¶ 7. He instructed McLaurin and Williams to treat Donaldson like any other employee, as if she had not made a complaint. *Id.*

---

[4] After returning from the Highway 49 store in August 2006, Donaldson called Maurice Williams to tell him that she was having work-related problems with McLaurin, but did not mention any sexual harassment complaints. *See* Def.'s App. 62-63 [Doc. 33-14] (May 15, 2008).

News of the EEOC complaint spread quickly among restaurant employees. Rumors circulated that Donaldson was attempting to recruit coworkers to act as witnesses against McLaurin in her harassment investigation. On November 11, 2006, when McLaurin called a meeting of all the female store employees, he did so with the ostensible purpose of reviewing the poor evaluation the store had recently received from the Popeye's national franchisor.[5] *See* Def.'s App. 65 [Doc. 33-14] (May 15, 2008). Donaldson, however, now believes that McLaurin really called the meeting so that he "could attack and humiliate [her] and intimidate any potential witnesses against him." *See* Pl.'s Br. Opp'n Mot. Summ. J. 20 [Doc. 38] (June 13, 2008). During the meeting McLaurin did not mention the complaint, but when another crew member broached the subject, he allegedly said to Donaldson, "You are the devil, you are trying to bring me down and you wouldn't have that red shirt [referring to the shirts worn by assistant managers] if it wasn't for me." *See* Def.'s Ex. D at 18 [Doc. 33-5] (May 15, 2008). Donaldson left the meeting upset and crying.

Over the next two months, Donaldson missed approximately thirteen days of work. *See* Def.'s App. 66 [Doc. 33-14] (May 15, 2008). She claims that she "couldn't go back in there" after the November meeting, in part because she felt repulsed by McLaurin and in part because her foot injury had been causing her more pain than usual. *Id.* In early January 2007, Maurice Williams, Allan Patterson and McLaurin called two meetings with Donaldson to discuss her job performance. *See* Def.'s Ex. K at 4 [Doc. 33-12] (May 15, 2008)*.* They asked her if she was

---

[5] Donaldson stated that McLaurin called the meeting to go over the poor evaluation the restaurant had recently received. *See* Def.'s App. 65 [Doc.33-14] (May 15, 2008). CDB, in its response to Donaldson's second EEOC charge, said the meeting was held so that female employees could "voice any concerns they might have about management and the workplace." *See* Pl.'s Ex. B at 9 [Doc. 38-3] (June 13, 2008). In response to a request for admission, CDB also stated that the meeting was held to discuss general employee morale. *See* Pl.'s Ex. D at 18 [Doc. 38-5] (June 13, 2008).

happy with her job, and expressed concern over her deteriorating performance and excessive absenteeism. *Id.* She told them that her foot injury had been bothering her, and they asked if she needed to go on medical leave. *See* Def.'s App. 66-67 [Doc. 33-14] (May 15, 2008). Shortly after the meeting, Donaldson submitted a doctor's note requesting medical leave. *Id.*

On February 1, while still on medical leave, Donaldson filed her second EEOC complaint against CDB alleging employer retaliation based on the November 11 employee meeting and the subsequent meetings with management regarding her performance. *See* Def.'s Ex. K at 4 [Doc. 33-12] (May 15, 2008). She sent her written resignation to Chunn on March 7. *See* Def.'s Ex. A [Doc. 33-2] (May 15, 2008).

On May 11, 2007, the EEOC issued a Notice of Right to Sue, stating that it was terminating its processing of Donaldson's charge. *See* Def.'s Ex. L [Doc. 33-13] (May 15, 2008). Donaldson then filed suit against CDB alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.* In her complaint she alleged several claims, including gender discrimination based on hostile work environment, retaliation, constructive discharge, intentional and negligent infliction of emotional distress and negligence per se. *See* Pl.'s First Am. Compl. [Doc. 4] (June 19, 2007). CDB subsequently moved for summary judgment on all claims.[6] *See* Def.'s Mot. Summ. J. [Doc. 32] (May 14, 2008).

## II. STANDARD OF REVIEW

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

---

[6] In her brief opposing CDB's motion for summary judgment, Donaldson concedes her negligent infliction of emotional distress and negligent supervision claims and agrees to enter into a voluntary dismissal of her negligence per se claim. *See* Pl.'s Br. Opp'n Mot. Summ. J. 32 [Doc. 38] (June 13, 2008).

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  To support a motion for summary judgment, "the moving party … [has] the burden of showing the absence of a genuine issue as to any material fact." *Burleson v. Tex. Dept. of Criminal Justice,* 393 F.3d 577, 589 (5th Cir. 2004). Material facts are those that "could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (internal citations omitted).  Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the court views all evidence "in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in its favor." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 331 (5th Cir. 2007).  If the movant satisfies its initial burden, then the burden shifts back to the nonmoving party to produce evidence indicating that a genuine issue of material fact exists for each essential element of its case. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 246-47 (5th Cir. 2003). The nonmovant is not entitled to merely rest on her pleadings, but must set forth "specific facts showing there is a genuine issue for trial." *DirecTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). If the nonmovant responds and still "no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

### III. APPLICATION AND ANALYSIS

In the companion cases of *Ellerth* and *Faragher*, the Supreme Court laid out the road map for analyzing supervisor sexual harassment cases under Title VII.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). At the first

stop on the *Ellerth/Faragher* road map, courts must determine whether or not the plaintiff employee has suffered a "tangible employment action." *See Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000). If she has, her suit is classified as a "quid pro quo" case. An employer accused of quid pro quo harassment will be vicariously liable per se, and will not be permitted to assert an affirmative defense if the tangible employment action resulted from his sexual harassment. *Id.* at 284.

If the employee has not suffered a tangible employment action, her suit goes forward as a "hostile work environment" case. An employer accused of hostile work environment harassment will also be held vicariously liable unless he can prove both prongs of the *Ellerth/Faragher* defense: (1) he exercised reasonable care to prevent and promptly remedy the harassment, and (2) the employee unreasonably failed to take advantage of the preventative and remedial opportunities provided by the employer or to otherwise avoid harm. *See Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 805.

### 1. Quid Pro Quo

The Court must pause at the first stop on the *Ellerth/Faragher* road map to determine whether Donaldson suffered a tangible employment action, since Donaldson alleges she was a victim of quid pro quo and hostile work environment sexual harassment.[7] Donaldson maintains that she suffered a tangible employment action because she was constructively discharged. Because she has not met the stringent evidentiary requirements necessary to establish a

---

[7] While Donaldson's amended complaint alleges sexual harassment based on hostile work environment, in her brief opposing summary judgment she alleges that she suffered both quid pro quo and hostile work environment harassment. *See.* Pl.'s Br. Opp'n Mot. Summ. J. 16 [Doc. 38] (June 13, 2008). The court will therefore address both.

constructive discharge, as discussed below, and no other specific tangible employment actions are alleged, her quid pro quo harassment argument fails.

A plaintiff alleging quid pro quo harassment must show both that (1) she suffered a tangible employment action and (2) the tangible employment action resulted from her acceptance or rejection of her supervisor's alleged sexual advances. *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002). The Supreme Court has defined a "tangible employment action" as "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761. Donaldson contends that she suffered a tangible employment action because she was constructively discharged. While the Fifth Circuit has held that a constructive discharge may constitute a tangible employment action,[8] the high evidentiary burden attached to stand-alone constructive discharge claims must still be met by the individual asserting quid pro quo harassment. As discussed below, Donaldson has failed to meet this burden. Since she suffered no other changes in her employment status prior to her resignation, and her resignation does not amount to a constructive discharge, Donaldson's quid pro quo harassment claim fails.

## 2. Constructive Discharge

To survive summary judgment on a constructive discharge claim, Donaldson must establish that her "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div.*, 512 F.3d 157, 167

---

[8] *See Wyatt v. Hunt Plywood Co., Inc.,* 297 F.3d 405, 410 n.15 (5th Cir. 2002) (finding that plaintiff did not "advance a coherent claim of constructive discharge or other tangible employment actions").

(5th Cir. 2007). Inquiry into whether an employee would feel forced to resign is case-and fact-specific, but courts consider the following factors relevant: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under younger or less experienced/qualified supervisor; (6) badgering, harassment, or humiliation by employer calculated to encourage employee's resignation; and (7) offers of continued employment on terms less favorable than employee's former status. *See id.*; *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 331 (5th Cir. 2004). In order to succeed on a constructive discharge claim, the plaintiff must show a greater degree of harassment than is required for a hostile work environment claim. *Lauderdale*, 512 F.3d at 167.

In her brief opposing summary judgment, Donaldson points to the same instances of harassment that she used to support her hostile work environment claim as evidence of the intolerable working conditions that forced her to resign. *See* Pl.'s Br. Opp'm Mot. Summ. J. 19 [Doc. 38] (June 13, 2008). She claims that McLaurin called the November 11, 2006 employee meeting to "attack and humiliate [her] and intimidate any potential witnesses against him." *Id.* at 20. While this accusation could potentially, when viewed in conjunction with McLaurin's alleged comments towards Donaldson, sustain a hostile work environment claim, it simply does not show the "greater degree of harassment" necessary for a viable constructive discharge claim.

Because Donaldson has failed to present any evidence—other than that supporting her hostile work environment claim—to show that her working conditions were intolerable, her constructive discharge claim should be dismissed.

### 3. Hostile Work Environment

11

Returning to the *Ellerth/Faragher* road map, the Court must next determine whether Donaldson suffered from a hostile work environment. Donaldson claims that the comments directed at her by McLaurin, his attempt to humiliate her at the November 11 meeting, and CDB's general lack of response to her harassment claims created a hostile work environment. She also claims the terms and conditions of her employment were affected by his harassment because, as she found it difficult to work with McLaurin after the November 11 meeting, she was not only prevented from advancing in her job, but was ultimately forced to quit.

A plaintiff alleging hostile work environment harassment must establish that (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition or privilege of employment. *Septimus v. University of Houston*, 399 F.3d 601, 611 (5th Cir. 2005).

For sexual harassment to be actionable, "it must be sufficiently severe or pervasive 'to alter conditions of the victim's employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal citations omitted). Not all harassment will affect a term, condition or privilege of employment. The Supreme Court has held that "the mere utterance of an …epithet which engenders offensive feelings in [an] employee does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21. "Simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 787. Conduct that is merely "boorish and offensive" will not constitute a hostile work environment. *Septimus,* 399 F.3d at 612.

Courts look at the totality of the circumstances to determine whether an environment is hostile or abusive, considering factors such as the frequency of the conduct, its severity, the degree to which it is physically threatening or humiliating as opposed to being a mere offensive utterance, and the degree to which it reasonably interferes with an employee's work performance. *Id.* at 611. The alleged harassment must have created an environment that was both subjectively and objectively offensive. *Id.*

Donaldson has not put forth enough evidence to raise a fact issue regarding the severity or pervasiveness of the alleged harassment. She points to several instances, occurring over the course of a year, where McLaurin directed comments toward her. These comments, while boorish and offensive, are not severe enough to support a hostile work environment claim. Donaldson also points to comments made generally by McLaurin to support her claim, but these can properly be classified as offhand remarks. It is difficult to see how his comments directed at other individual employees, though perhaps offensive to Donaldson, affected the terms and conditions of her employment. Donaldson admits that McLaurin never touched her inappropriately, never propositioned her for sex and never implied that her job was dependent upon their having sexual relations. While physical touching and sexually suggestive comments are not required to demonstrate a hostile work environment, the alleged conduct must in some way unreasonably interfere with a reasonable person's work performance. Viewing all the alleged conduct—that directed specifically at her and that directed at others—in the light most favorable to Donaldson, the Court does not believe it is severe or pervasive enough to support a hostile work environment claim.

Because there is no specific formula for determining whether the alleged conduct is severe or pervasive, the Court believes it is helpful to look at how other hostile work environment cases in the Fifth Circuit have been resolved. In *Shepherd v. Comptroller of Pub. Accounts*, Shepherd testified that her coworker told her "your elbows are the same color as your nipples," and "you have big thighs" while he simulated looking under her dress. *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 872 (5th Cir. 1999). The same coworker stood over Shepherd's desk several times in attempt to look down her clothing, "touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her," and twice patted his lap and remarked, "here's your seat." *Id.* The Fifth Circuit held that the coworker's comments did not give rise to a hostile work environment. *Id.* at 874-75. Similarly, no hostile work environment was found in *Hockman v. Westward Communications, LLC,* where the employee claimed her employer had grabbed her cheeks and tried to kiss her, had asked her to come into the office early so that they could be alone, and had stood in the door of the bathroom while she was washing her hands. *Hockman*, 407 F.3d at 328. The conduct alleged by Donaldson is at most on par with the conduct in *Hockman*, and certainly much less severe than that in *Shepherd*. Thus, dismissal of her claim is proper.

Since Donaldson has not raised a genuine issue that the harassment affected a term or condition of her employment, the Court does not need to address whether CDB exercised reasonable care to prevent and promptly remedy the harassment, or whether Donaldson unreasonably failed to take advantage of the remedial opportunities provided by CDB. However, even if Donaldson successfully established a hostile work environment claim, CDB would be protected under the *Ellerth/Faragher* affirmative defense. Donaldson knew that employees were

to report harassment complaints to their managers or, at least, to their supervisors. By going outside of store procedure and reporting her complaint directly to the EEOC, she did not give CDB an opportunity to respond to the harassment. She could not have reasonably taken advantage of CDB's remedial opportunities if it was never allowed to present any.

### 4. Retaliation

Lastly, the Court must consider Donaldson's retaliation claim. However, much like her other asserted claims, Donaldson has failed to demonstrate the existence of a genuine issue of material fact. Thus, her retaliation claim must be dismissed.

A plaintiff employee alleging retaliatory discharge must make a prima facie showing that (1) she was engaged in conduct protected by Title VII; (2) her employer took adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407-8 (5th Cir. 1999). If the employee makes a prima facie case, "the burden shifts to the employer to provide a legitimate, nonretaliatory reason for the adverse employment action." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir. 1999). If the employer gives a legitimate, nonretaliatory reason for the employment action, then the burden falls back to the employee to establish that the employer's proferred reason is actually a pretext for retaliation. *Id.* Specifically, the employee must prove that that the adverse employment action taken against her would not have occurred "but for" her protected conduct. *Septimus*, 399 F.3d at 608. Proving pretext becomes difficult when the employer gives a rational justification for the employment action, and the facts supporting that justification are not seriously disputed by the parties. *Chaney,* 179 F.3d at 168.

The parties do not dispute that Donaldson was engaged in protected conduct. Thus the first inquiry facing this court is whether CDB took adverse employment action against her. The Fifth Circuit has historically construed the meaning "adverse employment actions" to be equivalent to that of "ultimate employment decisions," or acts such as hiring, firing, granting leave, promoting and compensating employees. *See Watts v. Kroger*, 170 F.3d 505, 511 (5th Cir. 1999). Just as Donaldson failed to show a tangible employment action to support her quid pro quo claim, she has not demonstrated that CDB took any adverse employment actions against her to justify her retaliation claim. Donaldson was not demoted or fired, nor were her wages reduced. The only possible employment action that she could point to would be the performance meetings conducted by management in early January 2007, but at no time during or after those meetings were actions taken against her by CDB.

Even if Donaldson could establish that CDB took adverse employment action against her, and could further establish a causal connection between the action and her protected activity, she could not prove that CDB's proffered reason for its actions—her deteriorating work performance—was merely a pretext for retaliation. Donaldson admitted that she originally believed the November 11 employee meeting was called to discuss the restaurant's poor evaluation; she further admits that she missed numerous days of work after that meeting. Given the stringency of the "but for" test that she must meet to show that CDB's actions were pretextual, Donaldson's claim for retaliation cannot survive summary judgment.

## IV. CONCLUSION

The alleged conduct supporting Donaldson's sexual harassment claim against CDB, while perhaps insulting and inappropriate, does not warrant recovery under Title VII. Her constructive discharge and retaliation claims are similarly based on acts insufficient to merit recovery under Title VII. Because Donaldson has failed to show that any genuine issues of material fact exist as to any of her claims, CDB's motion for summary judgment should be granted.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the motion for summary judgment [#32] is **granted**.

SO ORDERED AND ADJUDGED on this day, the ___8th___ day of July, 2008.

> s/*Keith Starrett*
> UNITED STATES DISTRICT JUDGE